BAIRD, WILLIAMS & GREER, L.L.P.
6225 NORTH 24TH STREET, SUITE 125
PHOENIX, ARIZONA 85016
TELEPHONE (602) 256-9400
FACSIMILE (602) 271-9308

James B. Reed (AZ Bar No. 014015)
Attorneys for Plaintiffs Dobyns

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jay Anthony Dobyns, Gweneth Ann Jones, aka Gweneth Dobyns, Dale Jordan Dobyns, Jack Coogan Dobyns, | **CASE NO. 09-cv-112** |
| Plaintiffs, | |
| vs. | |
| Honorable Eric Holder, United States Attorney General, Office of the United States Attorney General, Honorable Michael Mukasey (former), Honorable Alberto Gonzales (former), U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington DC 20530, | **COMPLAINT** |
| and | |
| Ronald Carter, acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, 99 New York Avenue NW, Washington DC 20226. | |
| Defendants. | |
| United States Attorney's Office for the District of Arizona Attn: Civil Process Clerk Two Renaissance Square 40 North Central Ave., Suite 1200 Phoenix, AZ 85004 *Via Certified Mail* | |

United States Attorney General )
10th & Pennsylvania Avenue, NW )
Washington, D.C.  20530 )
*Via Certified Mail* )
)
)
)
)—
Ronald Carter, Acting Director )
Bureau of Alcohol, Tobacco, Firearms and )
Explosives )—
99 New York Avenue NW, Washington )
D.C.  20226 )—
*Via Certified Mail* )
)
_____ )

## JURISIDICTION

1.      The United States District Court has federal subject matter jurisdiction

for this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) and U.S. Constitution

Amendments 1, 14.  The United States Department of Justice has contested jurisdiction

of this Complaint in the United States Court of Federal Claims in Case No. 08-700C,

with the matter now filed in the District of Arizona.

## PLAINTIFFS

2.      The Plaintiffs are **Jay Anthony Dobyns (Dobyns)**, Special Agent, Bureau

of Alcohol, Tobacco, Firearms and Explosives (ATF);

3.      **Gweneth Ann Jones, aka Gweneth Dobyns,** wife of Dobyns (19 years of

marriage);

4.      **Dale Jordan Dobyns,** daughter of Dobyns (currently 17 years of age); and

5.      **Jack Coogan Dobyns,** son of Dobyns (currently 13 years of age).

6.      Gweneth Jones, Dale Dobyns and Jack Dobyns are the immediate family

of Dobyns (Family).

## **PERSONAL DEFENDANTS**

7.      Honorable Eric Holder, United States Attorney General, Michael B. Mukasey, (former) United States Attorney General, Alberto Gonzales, (former) United States Attorney General, United States Department of Justice, 950 Pennsylvania Avenue, NW, Washington DC 20530; and

8.      Ronald Carter, Acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, 99 New York Avenue, Washington DC 20226.

9.      The following are current and former ATF employees with the lead title following each defendant's name and describing their position at the time the alleged damages to Dobyns and Family occurred, and with the bolded title describing the defendants' present position;

A)      **Carl Truscott,** Director, **resigned;**

B)      **Edgar Domenech,** Deputy Director; **Special Agent in Charge, Washington Field Division;**

C)      **Michael Bouchard,** Assistant Director, **resigned;**

D)      **Dewey Webb,** Deputy Assistant Director, Western Region; **Special Agent in Charge, Houston Field Division;**

E)      **Lester Martz,** Special Agent in Charge, Phoenix Field Division; **retired;**

F)      **Joseph Gordon,** Assistant Special Agent in Charge, Phoenix Field Division; **resigned;**

G)    **Marvin Richardson,** Assistant Special Agent in Charge, Phoenix Field Division; **Chief, Professional Review Board;**

H)    **Sigberto Celaya,** Resident Agent in Charge, Tucson Field Office; no change in position ("**same**");

I)    **Richard Chase,** Assistant Director Office of Professional Review, **Special Agent in Charge, Denver Field Division;**

J)    **John Torres,** Special Agent in Charge, Los Angeles Field Division; **same;**

K)    **James Crowell,** Assistant Special Agent in Charge, Los Angeles Field Division; **resigned;**

L)    **Eleanor Loos,** Deputy Chief Counsel, Ethics; **same;**

M)    **Larry Ford,** Assistant Director, Public and Governmental Affairs; **same;**

N)    **Andrew Traver,** Special Agent in Charge, Chicago Field Division; **same;**

O)    **Kelvin Crenshaw,** Special Agent in Charge, Seattle Field Division; **Assistant Director, Office of Professional Responsibility;**

P)    **Scott Thomason,** Assistant Special Agent in Charge, Seattle, Field, Division; **Chief, International Programs Branch;**

Q)    **Anthony Torres,** Chief, Equal Employment Opportunity Commission; **ATF attorney;**

R)    **Marino Vidoli,** Chief, Special Operations Division; **same;**

4

S)    **Amy Walck,** Chief, Operation Security Branch; **same;**

T)    **Frank D'Alesio,** Special Agent in Charge, Undercover Branch; **same;**

U)    **William Newell,** Special Agent in Charge, Phoenix Field Division; **same;**

V)    **Charles Higman,** Resident Agent in Charge, Phoenix Field Division; **same;**

W)    **George Gillette,** Assistant Special Agent in Charge, Phoenix Field Division, **same;** and

X)    **Daniel Blumberg,** ATF retained psychiatrist; **unknown.**

## PARTIES INVOLVED (DESCRIPTION)

10.    Dobyns has been an ATF Special Agent for over 20 years.  During his career, Dobyns has built a heralded expertise in undercover operations, both nationally and internationally.

11.    Dobyns has been involved in over five hundred undercover law enforcement operations.  He has received numerous awards for his investigative accomplishments from ATF and, additionally, from local, state, federal and international law enforcement agencies.

12.    Dobyns has received two ATF Gold Star awards for traumatic injuries received in the line of duty, an ATF Distinguished Service Medal for investigative excellence and twelve ATF Special Act Awards for investigative achievement.  Most

recently he has received the International Narcotics Officers Association "Medal of Valor" award and the National Association of Police Organization's "Top Cop" award.

13.     Dobyns's wife and children constitute his **Family.**

14.     The United States Department of Justice (**DOJ**) is the leading law enforcement agency in the United States, headquartered in Washington, DC.  DOJ is statutorily bound to ensure the public safety against threats, both foreign and domestic, to provide federal leadership in preventing and controlling crime, to seek just punishment for those guilty of unlawful behavior, and to ensure fair and impartial administration of justice for all Americans.

15.     **ATF** is a federal law enforcement bureau within the DOJ, headquartered in Washington DC.  ATF is authorized to serve throughout the United States and abroad. ATF enforces the federal firearms, explosives and arson laws.  ATF's mission is the combating of domestic violent crime.

16.     ATF's leadership is comprised of men and women forming a hierarchy or chain of command of persons who, based on experience and performance, have been selected to their positions to represent and guide the operation of the agency.

17.     The Hells Angels (**HA**) is an organization historically the subject of investigation by the ATF and Federal Bureau of Investigation for alleged international crime syndicate activities, with over 2500 members assigned to over 250 official chapters, located within hundreds of U.S. cities, 25 states and over 30 countries.  The HA have members and associates in every State in the United States.

18.     The HA have a documented reputation known to ATF for participation in acts of extreme violence.  Those documented historical and current violent acts include, but are not limited to, murder, rape, torture, extortion and intimidation.

19.     The HA further have a reputation for retaliating against persons the HA deem adversarial to their organization, through witness murder, witness assault, witness intimidation and witness extortion.

20.     The HA further have a reputation of extending these violent acts to family members, friends and associates of persons the HA deems adversarial to their organization.

21.     The Aryan Brotherhood (**AB**) is a prison gang made up of violent convicted criminals who are serving or who have served prison sentences for criminal convictions.  AB members are known to associate with the HA and are known by ATF to carry out contracted-violence for pay or for benefit on behalf of other criminal organization, including the HA.  AB members are located in every state in the Untied States and in foreign countries.

22.     The Mara Salvatrucha (**MS-13**) is an El Salvadoran-based street gang feared for their extreme violence and brutality.  MS-13 members are known to associate with the HA and are known by ATF to carry out contracted-violence for pay or for benefit on behalf of other criminal organizations, including the HA.  MS-13 members are located in every state within the United States and are also located in foreign countries.

## SYNOPSIS OF CLAIM

23.     From 2001 to 2003 (21 months), Dobyns led an undercover ATF investigation that targeted the HA.  The investigation was entitled Operation Black Biscuit (**OBB).**

24.     Dobyns's work led to the unprecedented first-ever police infiltration of the HA in the HA's (then) fifty-five year history.  Numerous search and arrest warrants supplemented the federal indictment of sixteen or more HA members for, *inter alia,* violation of RICO laws.

25.     In order to best accomplish this mission, Dobyns's undercover role forced him to become immersed in the outlaw biker culture and lifestyle.

26.     Following the completion of OBB, Dobyns's true identify was revealed.

27.     Since then, Dobyns and Family have been subjected to a four-year-long series of continuous threats, oral and written, including but not limited to threats of murder, rape, assault, torture, general violence and brutality.  Those threats have been issued and enacted by or from members of the HA and their criminal associates.

28.     It is known to ATF that the HA offered murder contracts to the AB and the MS-13 to kill Dobyns.

29.     Most recently, on August 10, 2008, the home and belongings of Dobyns and Family were destroyed by arson.  The arson was set in a location directly adjacent to where Dobyns's children slept.  The arson is further classified as an attempted murder/arson on an occupied structure.

30.     Because of Dobyns's execution of his sworn duties as a United States law enforcement official and ATF Agent and further on behalf of ATF's mission statement, Dobyns and his family have been placed in continuous situations of severe safety risks.

31.     The basis of this claim contends that ATF has continually failed to approach even the most minimal standards of law enforcement safety practices by failing to properly assess, respond to, investigate, process or document any of these threats and occurrences.

32.     ATF has refused to adequately protect or defend Dobyns and Family from the threats coming from the very criminals and alleged syndicates that ATF encouraged Dobyns to investigate.

33.     Dobyns publicly challenged ATF for the agency's series of protection and investigation failures.  In a demonstration of an extreme example of a United States government agency abandoning an employee, Dobyns's supervisors at ATF have subjected and are subjecting Dobyns to unheard-of malicious reprisals including, but not limited to, ATF's refusal to investigate the arson of Dobyns's home and naming Dobyns as a suspect in the arson of Dobyns's family home and attempted murder of his family with no evidence or investigative activity to support the charge.

34.     Prior to the filing of this lawsuit and on multiple occasions, Dobyns appealed to ATF for attention to, and relief from the bad acts to which ATF senior managers were subjecting him.  ATF ignored those requests.

//

## CAUSES OF ACTION

35.     The current and historical bad acts of ATF supervisors have now contributed in whole or in part to the attempted murder of Dobyns and Family and the arson destruction of their home and belongings and to the ongoing damages they have suffered or are suffering.

36.     With a presentation of facts displaying ATF's bad actions against Dobyns and Family, the plaintiffs will prove facts and elements which include but are not limited to the following:

A)     ATF's breach of contract and constructive termination of Dobyns's employment (the contract being the Settlement Agreement between and among the parties);

B)     ATF's historical and ongoing use of reprisals;

C)     ATF's historical and ongoing creation of a hostile work environment;

D)     ATF's historical and ongoing use of harassment and discrimination;

E)     ATF's historical and ongoing use of relocation transfers as a reprisal;

F)     ATF's historical and ongoing use of slander and defamation;

G)     ATF's intentional relocation and separation of Dobyns from his family during periods of crisis following credible threats of violence;

H)     ATF's historical and ongoing failure to assess and respond to threats in any reasonable, timely or effective manner;

I)      ATF's historical and ongoing failure to investigate threats in any reasonable, timely or effective manner;

J)      ATF's historical and ongoing failure to protect Dobyns and family from threats in any reasonable, timely or effective manner;

K)      ATF's historical and ongoing failure to follow internal agency policy and procedure related to threats against employees;

L)      ATF's historical and ongoing failure to follow federal law related to victim-witness notifications and support;

M)      ATF's concealment of historical and current information regarding threats to the health and safety of Dobyns and Family;

N)      ATF's historical and ongoing failure to make proper notifications of known and credible information regarding threats or danger to Dobyns;

O)      ATF's historical and ongoing failure to develop any form of database or control documents, organized threat assessments, or reasonable techniques needed to maintain the status of location of suspects known to have threatened violence against Dobyns and Family;

P)      ATF's historical and ongoing failure to provide proper security backstopping, and intended with reasonable expectation to risk the health and lives of Dobyns and Family from known threats of violence;

Q)      ATF's recall of essential protective documents necessary to obtain and maintain covert residency locations and safe daily existence;

11

R)      ATF's violation of multiple oral contracts between ATF and Dobyns;

S)      ATF's improper and unethical use of internal legal resources and attorneys (Office of Chief Counsel and its staff attorneys) against Dobyns;

T)      ATF's willful, intentional and retaliatory use of internal mechanisms to defame Dobyns and to destroy his reputation and credibility (Office of Internal Affairs, Professional Review Board);

U)      ATF's failure to recuse or remove persons known to ATF to be involved in Dobyns's complaints as material witnesses, adversely affecting the career of Dobyns;

V)      ATF's acts of empowering those material witnesses to retaliate against Dobyns, with those witnesses ordering internal investigations and predetermining investigation outcomes and disciplinary measures against Dobyns;

W)      ATF's failure to cooperate with the Office of Inspector General for the Department of Justice, while investigating allegations made by Dobyns against ATF;

X)      ATF's known and intentional withholding of information critical to Dobyns's decision-making process prior to executing the Settlement Agreement contract;

Y)      ATF's knowing and willful intent to fabricate a false finding against Dobyns of mental/emotional unfitness for duty against Dobyns;

12

Z)     ATF's knowing and willful extortion of a doctor possessing Dobyns's and Family's medical records;

AA)    ATF's publication, release and/or exposure of Dobyns's medical records to defame, intimidate and coerce Dobyns;

BB)    ATF's selective application of internal policies and procedures against Dobyns;

CC)    ATF's current failure to reasonably investigate the arson of the home of Dobyns and Family;

DD)    ATF's current inaction and indecision (mismanagement) leading to a delayed response to the investigation of the arson of the home of Dobyns and Family by outside agencies;

EE)    ATF's current classification of Dobyns as a suspect in the arson fire, either formally or informally (an act of retaliation);

FF)    ATF's current failure to take any meaningful investigative steps to eliminate Dobyns from the arson suspect list, intentionally compounding the distress and misery of Dobyns and Family in a time of crisis, and constituting an additional act of retaliation;

GG)    ATF's intention to personally damage Dobyns by violating federal laws and statutes, which laws and statutes include those affording protections to victims of and witnesses to criminal acts, along with violations of HIPAA laws, obstruction of justice, acting as an accessory after the fact, defamation and conspiracy;

HH)   ATF's unlawful attempt to manipulate the official findings of a state and federal criminal (arson) investigation in order to intentionally damage Dobyns;

II)   ATF's overall disregard for the physical, mental, emotional and financial safety and well-being of Dobyns and Family;

JJ)   ATF's historical, uncorrected and ongoing tolerance for mismanagement, fraud, waste and abuse, and ATF's abuse of authority and whistleblower reprisals, all with reasonable cause to believe that these actions would cause significant damages to Dobyns and to Family;

KK)   ATF has knowingly engaged in and promoted damages to Dobyns and Family; and

LL)   Dobyns and Family have been damaged as a result.

//

//

//

//

//

//

//

**EVENTS GIVING RISE TO CLAIM**

**SECTION I:**

## BREACH OF CONTRACT, REPUDIATION OF CONTRACT AND CONSTRUCTIVE TERMINATION OF EMPLOYMENT THROUGH HOSTILE WORK ENVIRONMENT AND OTHER DAMAGING ACTS

***ATF's reprisal against Dobyns through a
willful and intentional violation of a Settlement Agreement.***

**September 2007 to the present.**

37.     On September 20, 2007, ATF and Dobyns voluntarily entered into a Settlement Agreement to compensate Dobyns and Family for bad acts conducted by ATF against Dobyns prior to that date.

38.     The Settlement Agreement drafted by ATF attorneys states that ATF agrees to pay to Dobyns certain monetary compensation under specific time constraints; to stop all future harassment, retaliation and whistleblower reprisals against Dobyns; to cease and desist from continuing those acts; to pardon and close all ongoing internal affairs investigations; and to grant immunity for all actions and defenses taken by Dobyns prior to the Agreement.

39.     ATF immediately, in a manner both knowing and willful, violated the Agreement by exceeding the payment time limits by six months.

40.     ATF knowingly and willfully allowed managers to perpetuate a hostile work environment for Dobyns, including harassment and whistleblower retaliations against Dobyns.

41.     ATF has knowingly and willfully continued prior or then-existing internal affairs investigations, along with reformatting and ordering new internal affairs investigations into Dobyns on over eleven different occasions.

42.     ATF ordered the recall of fictitious and covert identifications for Dobyns and his wife that were specifically designed and issued to protect the security of Dobyns and Family.

43.     ATF allowed supervisors who are or were adversarial material witnesses listed in Dobyns's complaints against ATF to order internal investigations of Dobyns; to predetermine those investigations' outcomes against Dobyns; to suggest disciplinary actions against Dobyns based on the tainted investigations; and to engage in prohibited whistleblower reprisals against Dobyns.  One of the accused is the ATF attorney who drafted the Settlement Agreement and subsequently delayed payment to Dobyns in violation of the payment schedule.

44.     Dobyns and his attorney made ATF aware of these breaches with over a dozen notifications through Dobyns's entire chain of command.  Those notifications were dismissed and delayed by ATF.

(Counts 1, 2, 3, 10, 11, 15;
As to Defendants Gordon, Richardson, Chase, J. Torres,
Crowell, Loos, Ford, Traver, Crenshaw, Thomason,
A. Torres, Vidoli, Walck, D'Alesio, Newell, Higman and Gillette)

## SECTION II:
## MISMANAGEMENT OF THREATS

*ATF's reprisal against Dobyns through their willful and intentional failure to assess, react to, investigate and/or protect Dobyns and Family from credible threats of death and violence.*

**August 2004.  (One year after Dobyns's involvement in OBB).**

45.     Dobyns was threatened with violence by an HA member in Tucson, Arizona.

46.     The HA member stated that the HA knew where Dobyns lived; where Dobyns worked; that the HA had conducted surveillance of Dobyns; that the HA knew that Dobyns had a wife and children; that Dobyns would "run from the HA for the rest of his life"; and that Dobyns was "going to get hurt."

47.     Dobyns's entire chain of command ignored the threats.  Dobyns's supervisors immediately conspired to initiate a smear campaign against Dobyns claiming that Dobyns was acting outside of approval and authority at the time of the threat.  The claims of inappropriate actions by Dobyns were quickly proven false.

48.     No further investigation was conducted.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, 15;
As to Defendants Truscott, Domenech, Bouchard,
Webb, Martz, Gordon, Richardson, Celaya and Chase)

**September 2004.**

49.     A Confidential Source of Information (CS #1) contacted ATF in Tucson, Arizona to report his first hand knowledge of death threats against Dobyns.

50.     CS #1 had been the cellmate of a suspect awaiting trial behind SA Dobyns's undercover work.  An ATF report documents that CS #1 advised agents that he "considered the threats viable in nature and expressed his concern for the safety of the agent."  CS #1 stated that the suspect "on multiple occasions stated that he wanted to place a gun to the back of Special Agent Dobyns's head and pull the trigger."  The informant further stated that the suspect "wants to personally commit these violent acts

himself."  The ATF report states: "it is unknown if (suspect) is receiving outside

assistance."

51.     Dobyns's entire chain of command ignored the threat information.  The

suspect was never questioned or confronted.  No further investigation was ordered.

Proposals to investigate the threats were denied by ATF supervisors.  The audio

recording of the CS #1 interview was intentionally and prematurely destroyed.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, 15;
As to Defendants Truscott, Domenech, Bouchard, Webb, Martz,
Gordon, Richardson, Celaya and Chase)

**November 2005.**

52.     A Confidential Source of Information (CS #2) who was an MS-13 member

advised ATF agents that he was personally aware of a plan to murder Dobyns.  CS #2

was incarcerated in Virginia at this time.

53.     CS #2 advised that he had been offered on several occasions a "contract"

to kill Dobyns by an AB member.  The AB was working in conjunction with the HA to

arrange the murder of Dobyns.  CS #2 advised that the request made of him to kill

Dobyns was made on behalf of the HA and the AB.

54.     CS #2 advised that the contract also called for locating and raping

Dobyns's then 15-year-old daughter.

55.     Dobyns's ATF entire chain-of-command was briefed on the threats either

personally or via email.

56.     For thirteen days no supervisor contacted Dobyns to advise him of the

status of an investigation or of ATF's plans for response.

57.     Fearing for the safety of his family, Dobyns decided to relocate his Family on his own.  While obtaining a U-Haul truck for the move Dobyns received his first call from an ATF supervisor who advised Dobyns that he would be punished by ATF for "taking matters into your [Dobyns] own hands.  You should have let us [ATF] handle this."

58.     The supervisor further advised Dobyns that, "it is my obligation to inform you that since you have chosen to take the resolution of the 'so-called' threats on yourself, ATF assumes no responsibility from this point forward for the safety or protection of your family members."

59.     Dobyns's entire chain of command ignored the threat information.  The suspect was never questioned or confronted.  No further investigation was ordered.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 13, 14;
As to Defendants Truscott, Domenech,
Bouchard, Webb, Chase, J. Torres and Crowell)

**November 2006.**

60.     ATF received information from a Confidential Source of Information (CS #3) that an HA plan intended to sue Dobyns in civil court with the intention of having Dobyns fired from ATF.  CS #3 advised that once Dobyns was outside of ATF protection the HA planned to "knock his [Dobyns] head off," e.g., commit the capital murder of Dobyns.  CS #3 was incarcerated in Arizona at this time.

61.     Dobyns's entire chain of command ignored the threat information.  The suspect was never questioned or confronted.  No further investigation was ordered.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 13, 14;
As to Defendants Chase, J. Torres, Crowell and Walck)

**November 2006.  (Separate event)**

62.    ATF received a copy of a handwritten letter intercepted in prison mail and composed by an HA member.  The HA member had been a suspect investigated by Dobyns during OBB.  The HA/suspect was incarcerated for the murder and beheading of a woman at the HA Mesa, Arizona Clubhouse.  The letter threatens Dobyns and Dobyns's wife in specific, graphic terms.

63.    ATF was fully aware that the HA/suspect had previously demonstrated the ability, willingness, mindset and resources necessary to arrange the murder of Dobyns and Family.  The HA/suspect wrote of methods to murder Dobyns and expressed the desire to arrange and videotape the gang rape of Dobyns's wife.

64.    ATF learned that CS #3 had knowledge of this letter.

65.    Dobyns's entire chain of command ignored the threat information.  The HA/suspect was never questioned or confronted.

66.    Dobyns complained to ATF that the threats against his wife were extreme and that ATF's willingness to disregard those threats was a mismanagement of ATF.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 13, 14;
As to Defendants Chase, J. Torres, Crowell, Walck and Newell)

**December 2006.**

67.    Two weeks later and only following Dobyns's complaint, ATF headquarters personnel suggested the interview of CS #3.

68.    The senior ATF supervisor in Phoenix, Arizona attempted to negatively influence and predetermine the interview's outcome by advising in the email requesting

the interview:  "I realize this is most likely going to be a waste of time but OPSEC in

BHQ is requesting we interview this guy. . . . I need this to be done within the next week

or so."   The lack of urgency to address real-time death and torture threats to Dobyns

was brought to the attention of ATF and challenged by Dobyns.  ATF ignored this

information.

69.     At the same time, ATF supervisors in New Orleans, Louisiana, which was

the field division directly receiving intelligence from CS #3, ordered CS #3's Control

Agent to discontinue his contact with CS #3 immediately.  The ATF supervisor in New

Orleans advised in an email:  "there is no reason for us to continue contact with the

informant" and "we [the New Orleans Field Division] are not going to work on a 'threat

investigation' outside of our division."  The decision to discontinue contact with an

information source directly involved with threats against an agent and his family at a

time critical to resolution of those threats was brought to the attention of ATF and

challenged by Dobyns.  ATF ignored this information.

70.     Four weeks after receiving the prison letter threatening death on Dobyns

and the rape of his wife, an ATF agent interviewed CS #3.

71.     During this interview CS #3 advised that yet another HA member (not the

author of the letter) had offered a new contract to murder Dobyns to an AB member

incarcerated with CS #3.  CS #3 advised that he had been encouraged by suspects to

further seek out someone willing to kill Dobyns.

72.     Dobyns's entire chain of command ignored the new threat information. Neither the HA/suspect or the AB/suspect were ever questioned or confronted.  No further investigation was ordered.

(Counts, 2, 3, 4, 5, 6, 7, 8, 9, 13, 14;
As to Defendants Chase, J. Torres, Walck and Newell)

**January 2007.**

73.     Dobyns was left a voice mail message by his supervisor advising that ATF had been "looking into" the intercepted jail letter and that ATF determined that "no threat exists."  The supervisor advised that ATF's investigation of the prison letter was a response to Dobyns's complaint and that Dobyns was not entitled to any further information regarding the investigation.  The supervisor advised Dobyns that, "You should now finally be satisfied."

(Counts 2, 3, 4, 5, 6, 7, 8, 9;
As to Defendants Chase, J. Torres and Walck)

**August 2008 to present.**

74.     An arson fire occurred at the residence of Dobyns and Family in Tucson, Arizona.  The home and contents were determined to be a near total loss by Dobyns's insurance company (State Farm Insurance).  The fire was determined to be arson (intentionally set) and to constitute an attempted murder/arson upon an occupied structure due to Dobyns's wife and children being in the residence.

75.     An ATF supervisor in Tucson, Arizona advised his agents while in the field and actively working on a low level operation on the day of the fire that, "Dobyns's

22

house was burned down but we are working this [gun show] now and will get to that when we are told to, maybe tomorrow."

76.     In spite of a four year history of violence and death threats against Dobyns, the senior ATF supervisor in Phoenix, Arizona dispatched only one investigator to the scene, and did so a full thirty hours after the incident.

77.     The supervisor was heard by witnesses to state, "we just need to make a showing down there so this guy [Dobyns] doesn't come back to us later."  And, "this is not my problem.  He [Dobyns] works for headquarters, not for me.  They [ATF Headquarters managers] need to figure this out."  This same supervisor displayed his prejudiced and retaliatory treatment of Dobyns and his Family by negatively pre-determining interview conclusions related to death and violence threats against Dobyns and Family (*Event Dates: November 2005; November 2006*).

78.     No ATF supervisor responded or was dispatched to the crime scene.

79.     ATF first took the position that the agency did not want to investigate for the possibility of threats against a federal agent.  ATF later changed their mind and took the investigation away from the local police agency.  ATF then, again, changed their mind and gave the investigation to the FBI.  This confusion caused significant delays in reacting to real-time investigative leads.

80.     Sixteen days after the arson, an ATF supervisor offered to Dobyns to have the agency transfer Dobyns and Family to a location out of the area.  During this meeting Dobyns advised the ATF supervisor in specific detail how poorly ATF had

responded to the arson.  Dobyns advised the supervisor that ATF had shown no interest in investigating leads that could lead to the apprehension of a suspect.

81.    Dobyns learned that, again, ATF had not followed any internal or investigative protocols following the arson.  Dobyns was advised that ATF again had failed to offer or provide any victim/witness information to Dobyns and Family. Dobyns advised the supervisor that his prior allegations were set to be presented in a report issued from the Office of the Special Counsel and the U.S. Inspector General. Dobyns advised the supervisor that each of Dobyns's prior allegations against ATF had been confirmed and that ATF's most recent response to the arson indicated a worsening of treatment for threatened agents.

82.    Later that day Dobyns learned that ATF had named Dobyns as a suspect in the arson/attempted murder at his own home.  With this allegation came the automatic stigma of Dobyns allegedly attempting to murder his wife and children by arson.  The determination to name Dobyns a suspect was generated by the same senior ATF Phoenix supervisor (and supervisors Phoenix and Tucson subordinates) that had previously and now routinely showed prejudicial treatment toward Dobyns (*Event Dates:  November 2005; November 2006*).

83.    ATF Phoenix supervisors attempted to manipulate and influence the official determination of the fire away from arson and towards a conclusion of 'undetermined'.  A finding of undetermined would allow ATF an opportunity to backpedal from their failed response to the fire and subsequent lack of an investigation.

84.     However, ATF was unable to cause the arson investigators to compromise their professional integrity or that of the investigation, with the result that the fire was determined to be arson.

85.     Dobyns advised his immediate supervisor that he was willing to submit to additional interviews (by then Dobyns had provided five interviews, two recorded),  take a polygraph examination, and volunteer all of his financial, insurance, credit card and telephone or any other confidential or personal records for investigation in order to be eliminated from the suspect list.  Dobyns further offered a verifiable alibi for the fire. ATF ignored and dismissed this information and offer to cooperate.

86.     Dobyns advised his supervisor that his family was severely distressed following the loss of their home and the attempt to murder them.  Dobyns advised that he believed that ATF had placed Dobyns on their suspect list to disguise ATF's own mishandling of the incident and investigation.

87.     ATF had conducted no investigation of real leads or real suspects in the arson.  ATF had instead relied on rumor, innuendo, and speculation and settled to name Dobyns a suspect, further adding to the distress that Dobyns and Family were experiencing at a time of extreme crisis.

88.     During none of these threats or failed responses was Dobyns or Family offered any victim/witness support as mandated to ATF by Federal law.

89.     The following actions by ATF all indicate and are evidence of continuing abuses targeting Dobyns: ATF's failure to respond to the arson; its failure to investigate known facts and leads; its presentation of a flawed plan to transfer Dobyns; its attempt

to manipulate official investigative findings; and its rush to judgment against Dobyns by naming him as an arson/attempted murder suspect without the most elemental levels of investigation.

(Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14;
As to Defendants Chase, Walck, Newell, Higman and Gillette)

**September 2008.**

90.    The resurrection of the HA/Mongol Motorcycle Club "war" continued with the murder of an HA member by a Mongol in San Francisco, California and then the retaliatory pipe bombing of a Mongol by an HA in Santa Clara, California.

91.    Following the pipe bombing, ATF immediately dispatched an entire team of investigators to the crime scene.  The team included a full field office of agents (San Jose), two ATF supervisors, bomb and accelerant K-9's, equipment and explosive experts from San Francisco.

92.    The investigative team was assembled immediately after the bombing with a proactive investigative plan, supervised by ATF managers and executed by dozens of field agents.

93.    This response serves as a demonstration how ATF should, and does, respond when following proper procedure and not motivated by retaliation and slander.

94.    ATF followed policy, procedure and law in this incident (occurring approximately one month after the Dobyns home arson), including notification of the victims and witnesses of their rights.  ATF failed to do so for Dobyns and Family following their arson event.

26

95.     ATF undertook this investigative and protective response on behalf of a criminal suspect on a criminal suspect crime event for known members of a known criminal syndicate; and yet, ATF failed to exhibit any similar level of responsiveness concerning the arson on the home of Dobyns and the attempted murder of his family.

96.     ATF intentionally denied Dobyns and Family these rights as a reprisal.

97.     Further, a public statement on behalf of ATF was issued to the San Francisco Chronicle newspaper by the senior Los Angeles supervisor who: failed to respond to threats against Dobyns and Family (*Event dates: November 2005; November 2006; January 2007*); failed to protect Dobyns and Family (*Event date: November 2005*); attempted to create a false finding that Dobyns was mentally unfit for duty (*Events dates: January 2006; February 2006*); and pre-emptively defamed Dobyns with the intent to damage Dobyns's career and reputation (*Event date: December 2006*).

98.     Representing ATF senior leadership, the Los Angeles supervisor advised: "any time there's violence between two gangs like this, who are willing to do physical harm and damage, my concern is for innocent bystanders.  I'm very concerned for our community and very concerned for law enforcement – I would hate to see an innocent child, an innocent person, caught in the cross-fire."  This supervisor displayed no such concern or passion when his own agents [Dobyns] life was at risk or for the safety of Dobyns Family.

99.     ATF Phoenix supervisors further manipulated the official investigative findings of the arson at Dobyns's home, conspiring to cover up ATF's failure to respond to or investigate the arson.  They have threatened, disciplined, attempted to intimidate

and removed agents resistant to their cover-up. They took personal control of the investigation away from agents and closed the investigation at their earliest opportunity. ATF Agents have contacted Dobyns and advised Dobyns that he is being "railroaded" by Phoenix ATF supervisors and that their mismanagement of the arson and subsequent investigation is an "atrocity."

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14;
As to Defendants J. Torres, Newell, Higman and Gillette)

## SECTION III:
## DEFAMATION

*ATF's reprisal against Dobyns through their willful and intentional defamation of Dobyns's personal and professional reputation.*

**September 2004.**

100.    An ATF Phoenix supervisor (now resigned) began proactive and ongoing character assassination of Dobyns.  The supervisor stated in front of multiple witnesses on multiple occasions, "Dobyns is mentally unfit for duty," "Dobyns is broken," and "it is my duty to see that Dobyns is removed from this field division (Phoenix) and this agency."  The Phoenix supervisor used this false allegation to inspire and prejudice Los Angeles supervisors against Dobyns (*Event dates: January 2006; February 2006*).

(Counts 10, 11, 15;
As to Defendant Gordon)

**September 2006.**

101.    The ATF Phoenix supervisor was permitted unethical contact with ATF Internal Affairs investigators and encouraged their 'whitewashing' of facts during an internal "fact finder" review of Dobyns's complaints against ATF.

28

102.   The supervisor stated in front of multiple witnesses on multiple occasions that he had been advised that, "behind closed doors," an ATF Internal Affairs Investigator had classified Dobyns as "certifiable" (psychologically unhealthy).  He also boasted that he had negatively influenced ATF's internal affairs investigators to adopt his conclusions and opinions on Dobyns's mental health into their findings.

103.   At this time the supervisor also slandered Dobyns's wife to his subordinates by making known false statements that Dobyns's wife had abandoned Dobyns and filed official complaints with the federal government regarding Dobyns's alleged misconduct.  This false allegation caused Dobyns's wife great distress.

(Counts 10, 11, 15;
As to Defendants Gordon and Chase)

**January 2006.**

104.   Dobyns presented to his senior ATF Los Angeles supervisor an employee grievance that alleged that the supervisor's subordinate (also in Dobyns's chain of command) was guilty of abuse of authority, fraud, waste and abuse, and harassment.

105.   Shortly thereafter, the supervisor presented Dobyns with a memorandum, prepared and signed by supervisor's subordinate.  The memorandum intentionally fabricated and attributed false statements to Dobyns, claiming that Dobyns had stated: "right now I am a danger to myself and to ATF."

106.   The memorandum documented the supervisor's and subordinate supervisor's early attempts to falsely portray Dobyns as mentally/emotionally unfit for duty.  The ATF actors were fully aware that a determination of unfitness for duty serves as grounds for dismissal from ATF.

29

107.   The Los Angeles supervisors had consulted with the ATF Phoenix supervisor (*Events dates: September 2004; September 2006*) before presenting the memorandum to Dobyns.

108.   Dobyns refused to accept the memorandum instead advising the senior supervisor that the memorandum was "a frame job."  The supervisor panicked and asked Dobyns's permission to take back the memorandum, asking Dobyns to return the memorandum to him.  Dobyns, recognizing the memorandum's evidentiary value, refused the request.

109.   One week later, Dobyns was mailed an updated memorandum that removed the slanderous and prejudicial comments.

//

//

//

(Counts 10, 11;
As to Defendants Gordon, J. Torres and Crowell)

**February 2006.**

110.   As a member of the ATF undercover program, Dobyns has participated in regular mental health assessments with an ATF-retained psychiatrist.  Dobyns and all members of the undercover program were constantly advised that the psychological services provided to undercover operatives were, without exception, personal and confidential and used specifically to assist agents whose assignments place them under extreme stress.

111.    The ATF psychiatrist also counseled Dobyns Family members, after the psychiatrist gave explicit guarantees that their session was personal and confidential.

112.    The subordinate Los Angeles supervisor continued his quest to charge Dobyns as unfit for duty.  The subordinate supervisor attempted to illegally obtain Dobyns's mental health records in violation of Dobyns's doctor/patient rights and HIPAA protections.

113.    The subordinate supervisor ultimately convinced an ATF headquarters supervisor to obtain Dobyns's mental health information from the ATF-retained psychiatrist by extorting the records from the psychiatrist.  The headquarters manager threatened to discontinue the psychiatrist's retainer if the doctor did not release Dobyns's medical records to him.

114.    The retained psychiatrist provided the headquarters supervisor a briefing on his privileged and confidential sessions with Dobyns.  The psychiatrist later apologized to Dobyns and advised Dobyns that the psychiatrist was coerced and extorted into providing Dobyns's privileged information for fear that he would lose his ATF-funded retainer contract.

(Counts 10, 11, 12;
As to Defendants J. Torres, Crowell and Blumberg)

**November 2006.**

115.    During September and October 2006, ATF conducted a demonstrably inadequate, internal "fact finder" investigation into Dobyns's allegations against ATF.

116.    The investigation was tailored to result in a conclusion that was dismissive of Dobyns's claims and supportive of ATF's mistreatment of Dobyns.  The report

further adopted the opinions regarding Dobyns's mental health, concerning which opinions the Phoenix ATF supervisor had boastfully attributed himself as the source (*Event Date:  September 2006*).

117.    The flawed and tainted fact-finder decision was used to support a "Final Decision" memorandum.  A senior ATF supervisor signed and mailed the memorandum to Dobyns, which admitted that ATF "is guilty of mismanagement in the handling of various threats against Dobyns's life and Family; failing to properly communicate with Dobyns during the threat situations; and, having created a hostile work environment for Dobyns."

118.    The memorandum attempted to reassure Dobyns that ATF had "redoubled efforts" in the agency's response to threats against agents.  The supervisor stated that none of ATF's mistakes were intentional and that ATF would offer no relief or apology to Dobyns.  The supervisor concluded by advising Dobyns that ATF's determination was "final" and that Dobyns's complaints "were exhausted in full."

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 15;
As to Defendants Truscott, Domenech, Bouchard, Webb, Martz,
Gordon, Richardson, Celaya, Chase, J. Torres, Crowell and Loos)

**December 2006.**

119.    The senior Los Angeles ATF supervisor (*Event Dates: November 2005; November 2006; December 2006; February 2006*) furthered his ongoing and personal campaign of character decimation and character assassination against Dobyns by conspiring with other ATF supervisors to defame Dobyns to his peers and other law enforcement agencies outside of ATF.

120.    The Los Angeles supervisor enlisted the support of ATF supervisors in Chicago and Seattle to obstruct justice by defaming Dobyns as a government witness. The Los Angeles supervisor also attempted to recruit ATF attorneys into his defamation scheme.

121.    The Los Angeles supervisor convinced his peers in Chicago and Seattle to proactively advise United States Attorney Offices, prosecutors and law enforcement agencies outside of ATF that Dobyns was unfit to testify in Federal RICO and murder trials.

//

//

//

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14;
As to Defendants J. Torres, Crowell, Traver, Crenshaw and Thomason)

**January 2007.**

122.    Dobyns then enlisted Arizona Senator John McCain to assist in helping Dobyns seek resolution to ATF's abuses.  McCain's Chief of Staff advised Dobyns that ATF was "stonewalling" the Senator's efforts to seek resolution for Dobyns.

123.    The McCain Senate Office Chief of Staff advised Dobyns that ATF appeared to maintain an "institutional arrogance" and "a bad habit of finger pointing to deflect from their errors."

124.    ATF later provided a letter to Senator McCain signed by an ATF headquarters supervisor.  The letter knowingly and intentionally deceives Senator

33

McCain by advising that ATF is guilty of no wrong-doing in the matters of Dobyns.
This letter is entirely dismissive of Dobyns's allegations.  The deception of Senator
McCain was planned with the full knowledge that ATF had internally concluded that it
was guilty of misconduct in the matters concerning Dobyns.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14;
As to Defendants Loos and Ford)

**January 2007.**

125.    The Phoenix ATF supervisor (*Event Dates: August 2004, September
2004, November 2005, September 2006, November 2006*) in anticipation of a
newspaper article expected to criticize ATF's mismanagement of Dobyns's threats,
prepared an email that he sent to each of his subordinates.  The supervisor continued
his personal assault on Dobyns advising subordinates to disseminate the message to all
field agents (Dobyns's peers) containing information that they (Agents) were about to
be "betrayed by one of our own."  The Phoenix supervisor's email was an attempt to
alienate Dobyns from his peers.

126.    One day after the article was published, the supervisor attempted to
threaten and intimidate Dobyns by stating in email messages further targeting
Dobyns's peers by stating that, "[t]he betrayal of trust carries a heavy taboo."  The
message further compared Dobyns to convicted spy Aldrich Ames.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11;
As to Defendant Gordon)

**August 2008.**

127.   Arson destroyed the home and belongings of Dobyns and Family.  The arson was also an attempt to murder Dobyns's family.

128.   The following actions and inactions by ATF, undertaken subsequent to the arson at Dobyns's home, defamed Dobyns's reputation within and beyond ATF. Those actions include: ATF's failure to respond to the arson; ATF's failure to investigate known facts and leads; attempts to steer investigative findings in a direction favorable to ATF and away from the truth; and ATF's rush to judgment against Dobyns by naming him as a suspect for arson and attempted murder.

(Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14;
As to Defendants Gordon, Newell, Higman and Gillette)

//

//

**SECTION IV:**
**TRANSFERS / RELOCATIONS**

***ATF's reprisal against Dobyns through their willful and intentional misuse/abuse***
***of transfers and relocations.***

**December 2004.**

129.   Following Dobyns's threats from an HA member (*Event Date: November 2004*) ATF transferred Dobyns and Family from Arizona to California (Santa Maria, CA).   ATF failed to properly backstop or protect that transfer and Dobyns and Family were left exposed to criminals seeking to harm them.

130.   Dobyns and Family moved themselves four additional times, at their own expense and under pseudonyms, attempting to protect themselves from threats after ATF failed to offer or undertake protection of them.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 15;
As to Defendants Truscott, Domenech, Bouchard, Webb,
Martz, Gordon, Richardson and Celaya)

**November 2005.**

131.   With Dobyns now in California, and following new threats made against Dobyns by the HA, AB and MS-13 (*Event Date:  November 2005*) ATF offered, then retracted, transfers of Dobyns and Family to Houston, Texas, and to the ATF National Academy, Brunswick, Georgia.

132.   Dobyns and ATF agreed to transfer Dobyns from Santa Maria, California, to Los Angeles, California.

133.   ATF then immediately reassigned Dobyns to ATF headquarters, Washington D.C.  This created an enormous distance of separation between Dobyns and Family.  ATF supervisors advised Dobyns that Los Angeles was not a safe location for him at this time.  The ATF Los Angeles subordinate supervisor advised Dobyns: "a lot of us have had to be away from our families for the job.  You signed a mobility agreement, didn't you?"

134.   Dobyns advised ATF that Washington D.C. was a "hotbed" for MS-13 activity and was no safer a location for him to reside in, than was Los Angeles, with ATF having actual knowledge that the MS-13 had been offered murder contracts to kill Dobyns.

135.   ATF advised that Dobyns would be required to remain in Washington D.C. for one year.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 15;
As to Defendants Truscott, Domenech, Bouchard, Webb,

J. Torres and Crowell)

**December 2006.**

136.    Dobyns's ATF second line supervisor in Los Angeles met with Dobyns. The supervisor advised Dobyns that Dobyns, "had worn out his welcome with ATF" and that, "if I have my way you'll spend the rest of your career in Headquarters or Guam.  I am familiar with Anderson Air Force Base there.  It is a postage stamp in the middle of nowhere.  A perfect place for you [Dobyns] to finish your career."

137.    Dobyns asked the supervisor if ATF had conducted a threat assessment for Los Angeles to justify Dobyns's transfer to Washington.  The supervisor advised Dobyns that, "you are a liability to ATF both for risk and financially.   The threat assessments are on a need-to-know basis and you don't need to know."

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 15;
As to Defendants Truscott, Domenech, Bouchard, Webb,
J. Torres and Crowell)

**March 2006.**

138.    After using accrued vacation time Dobyns reported to Washington, D.C.

**May/June 2006.**

139.    Dobyns filed comprehensive complaints against ATF with the Office of Special Counsel, the U.S. Inspector General, the Equal Employment Opportunity Commission, the Workers Compensation Board, and several U.S. Congressmen and Senators.

140.    On June 5, 2006, Dobyns made ATF aware of his filing of these complaints.

141.    On June 8, 2006, (three days after Dobyns advised ATF of his complaints and nine months short of completing his headquarters assignment) ATF ordered Dobyns to return to Los Angeles.  An ATF supervisor advised Dobyns that "the eighth floor (referring to the offices of ATF's highest level managers) wants you out of here, and it has something to do with your complaints."

142.    Dobyns reminded ATF that he had been transferred out of Los Angeles for alleged safety reasons and that he was told he would be in Washington for one year to satisfy ATF's safety concerns.

143.    Dobyns asked ATF if a threat assessment had been conducted to justify his return transfer to Los Angeles.  Dobyns was advised by his ATF supervisor that "[t]hey (ATF's highest level managers) want you out of here by the next pay period. That is all I know."

144.    Dobyns then reported back to Los Angeles.

(Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 15;
As to Defendants Trustcott, Domenech, Bouchard, Webb,
Chase, J. Torres, Crowell, Loos and Walck)

**August 2008.**

145.    Dobyns, now assigned to Washington D.C. but residing in Tucson, Arizona, was, along with his Family, the victim of an arson fire.

146.    After over two weeks of delays and internal strategizing, ATF offered transfer options out of Tucson to Dobyns.  No investigation had been done.  Only unconfirmed conclusions had been drawn to name Dobyns as an arson suspect.  ATF

sought to add to the misery of Dobyns and Family in their present state as victims of the fire, by serving Dobyns with a relocation transfer.

(Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11;
As to Defendants Chase, Walck, Newell, Higman and Gillette)

**September 2008.**

147.   ATF Phoenix supervisors are engaged in an ongoing obstruction of justice by attempting to manipulate the official finding of ATF arson experts.  This obstruction is designed to disguise ATF's failed response to the arson and defame Dobyns and further create a need to him transfer him out of Arizona.

(Counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14;
As to Defendants Newell, Higman and Gillette)

**STATUTES VIOLATED**

148.   ATF and its representatives are alleged to have violated the following:

**Count 1:**
Breach of Contract/Tucker Act
Title 28, United States Code, Section 1491
(With respect to employee actions of Gordon, Richardson, Chase, J. Torres, Crowell, Loos, Ford,  Traver, Crenshaw, Thomason, A. Torres, Vidoli, Walck, D'Alesio, Newell, Higman and Gillette)

**Count 2:**
Whistleblower Reprisal
Title 5, United States Code, Section 2302(b)(8)
(With respect to employee actions of Gordon, Richardson, Chase, J. Torres, Crowell, Loos, Ford,  Traver, Crenshaw, Thomason, A. Torres, Vidoli, Walck, D'Alesio, Newell, Higman, Gillette, Truscott, Domenech, Bouchard, Webb, Martz and Celaya)

**Count 3:**
Whistleblower Reprisal
Title 5, United States Code, Section 1221(e)

39

(With respect to employee actions of Gordon, Richardson, Chase, J. Torres, Crowell, Loos, Ford, Traver, Crenshaw, Thomason, A. Torres, Vidoli, Walck, D'Alesio, Newell, Higman, Gillette, Truscott, Domenech, Bouchard, Webb, Martz and Celaya)

**Count 4:**
No Fear Act
Public Law 107-174
(With respect to employee actions of Truscott, Domenech, Bouchard, Webb, Martz, Gordon, Richardson, Celaya, Chase, J. Torres, Crowell, Walck, Newell, Higman, Gillette, Loos, Traver, Crenshaw, Thomason and Ford)

**Count 5:**
Crime Victims Rights
Title 18, United States Code, Section 3771
(With respect to employee actions of Truscott, Domenech, Bouchard, Webb, Martz, Gordon, Richardson, Celaya, Chase, J. Torres, Crowell, Walck, Newell, Higman, Gillette, Loos, Traver, Crenshaw, Thomason and Ford)

**Count 6:**
Federal Victim and Witness Protection Act of 1982
(With respect to employee actions of Truscott, Domenech, Bouchard, Webb, Martz, Gordon, Richardson, Celaya, Chase, J. Torres, Crowell, Walck, Newell, Higman, Gillette, Loos, Traver, Crenshaw, Thomason and Ford)

**Count 7:**
Crime Control Act of 1990
(With respect to employee actions of Truscott, Domenech, Bouchard, Webb, Martz, Gordon, Richardson, Celaya, Chase, J. Torres, Crowell, Walck, Newell, Higman, Gillette, Loos, Traver, Crenshaw, Thomason and Ford)

**Count 8:**
Violent Crime Control and Law Enforcement Act of 1994
(With respect to employee actions of Truscott, Domenech, Webb, Martz, Gordon, Richardson, Celaya, Bouchard, Webb, Chase, J. Torres, Crowell, Walck, Newell, Higman, Gillette, Loos, Traver, Crenshaw, Thomason and Ford)

**Count 9:**
Justice for All Act of 2004
(With respect to employee actions of Truscott, Domenech, Bouchard, Webb, Martz, Richardson, Celaya, Chase, J. Torres, Crowell, Walck, Newell, Higman, Gillette, Loos, Traver, Crenshaw, Thomason, Ford and Gordon)

**Count 10:**
Defamation
Civil violations of slander, libel and vilification
(With respect to employee actions of Gordon, Richardson, Chase, J. Torres, Crowell,
Loos, Ford, Traver, Crenshaw, Thomason, Torres, Vidoli, Walck, D'Alesio, Newell,
Higman, Gillette, Newell, Blumberg,Truscott, Domenech, Bouchard,
Webb, Martz and Celaya)

**Count 11:**
Conspiracy to Defame
Title 18, United States Code, Section 371
(With respect to employee actions of Gordon, Richardson, Chase, J. Torres, Crowell,
Loos, Ford,  Traver, Crenshaw, Thomason, A.Torres, Vidoli, Walck, D'Alesio, Newell,
Higman, Gillette, Blumberg, Truscott, Domenech, Bouchard, Webb, Martz and Celaya)

**Count 12:**
Health Insurance Portability and Accountability Act of 1996 (HIPAA)
Public Law 104-191
(With respect to employee actions of J. Torres, Crowell and Blumberg)

**Count 13:**
Obstruction of Justice
Title 18, United States Code, Section 2
(With respect to employee actions of Truscott, Domenech, Bouchard, Webb, Martz,
Gordon, Richardson, Celaya, Chase, J. Torres, Crowell, Walck, Newell, Higman,
Gillette, Traver, Crenshaw, Thomason, Loos and Ford)

**Count 14:**
Accessory After The Fact
Title 18, United States Code, Section 3
(With respect to employee actions of Truscott, Domenech, Bouchard, Webb, Martz,
Gordon, Richardson, Celaya, Chase, J. Torres, Crowell, Walck, Newell, Higman,
Gillette, Traver, Crenshaw, Thomason, Loos and Ford)

**Count 15:**
Intentional Misstatements under Oath with Intent to Cause Injury to Dobyns
Title 18  United States Code, Section 1001
(With respect to employee actions of Loos, Ford, Traver, Crenshaw, Thomason, A.
Torres, Vidoli,  Walck, D'Alesio, Newell, Higman, Gillette, Truscott, Domenech,
Bouchard,  Webb, Martz, Gordon, Richardson, Celaya, Chase, J. Torres and Crowell)

## **WITNESSES**

The following persons are known to have information relevant to this complaint, regardless of the supportive or adverse nature of the evidence.

1)      Inspector General Investigator Michael Fletcher, Washington D.C.

2)      ATF Special Agent Darrin Kozlowski, Los Angeles, CA.

3)      ATF Special Agent Joe Slatalla, Phoenix, AZ.

4)      ATF Special Agent Chris Livingstone, Phoenix, AZ.

5)      ATF Resident Group Supervisor Kim Balog, Washington D.C.

6)      ATF Chief Madison Townley, Washington, D.C. (resigned)

7)      ATF Attaché John Cooper, Washington D.C.

8)      ATF Chief Carlos Sanchez, Washington D.C.

9)      ATF Special Agent in Charge Dewey Webb, Houston, TX

10)     ATF Special Agent Sean Hoover, Tucson, AZ.

11)     ATF Special Agent Jim Small, Tucson, AZ.

12)     ATF Special Agent Vince Cefalu, Stockton, CA.

13)     ATF Special Agent Chris Bayless, Chicago, IL.

14)     ATF Public Information Officer Tom Mangan, Phoenix, AZ.

15)     ATF Special Agent Greg Cowan, Phoenix, AZ.

16)     ATF Group Supervisor Louis Quinonez, Phoenix, AZ.

17)     ATF Chief Dan Machonis, Washington D.C.

18)     ATF Special Agent John Carr, Los Angeles, CA.

19)    ATF Special Agent Josh Rusk, Los Angeles, CA.

20)    ATF Special Agent Jenna Maguire, San Diego, CA.

21)    ATF Special Agent Paul Hagarty, San Diego, CA.

22)    ATF Special Agent John Ciccone, Los Angeles, CA.

23)    ATF Chief J.D. Newman, Washington D.C.

24)    ATF Program Manager Mark Swartswelder, Brunswick, GA.

25)    ATF Group Supervisor Greg Plott, Washington D.C.

26)    ATF Assistant Special Agent in Charge Robert Elder, Houston, TX.

27)    ATF Assistant Special Agent in Charge Jeff Vind, San Francisco, CA.

28)    ATF Confidential Sources of Information (listed as CS #1, CS #2, and CS

        #3 in this document), locations not revealed at this time.

29)    ATF Assistant Special Agent in Charge Joe Anarumo, New York, NY.

30)    ATF Chief Richard Trent, Washington D.C.

31)    ATF Special Agent Jeff Grabman, Falls Church, VA.

32)    ATF Special Agent in Charge Frank D'Alesio, Washington D.C.

33)    ATF Group Supervisor Carlos Canino, St. Louis, MO.

34)    ATF Intelligence Analyst Mike Will, Washington D.C.

35)    ATF Group Supervisor Eric Harden, Los Angeles, CA.

36)    ATF Security Specialist Ernest Hickman, Washington D.C.

37)    Arroyo Grande Police Department Detective Albert Beattie, Arroyo

        Grande, CA.

38)    ATF Special Agent Gwen Golden, Washington D.C.

39) ATF Special Agent Dan Hebert, New Orleans, LA.

40) ATF Program Manager Patrick Sullivan, Washington D.C.

41) Members both Known and Unknown assigned to the ATF Professional Review Board for August 2008, various locations.

42) Santa Cruz County Sheriff's Office Detective Roy Morales, Gilroy, CA.

43) Stockton Police Department Detective Vito Bertochini, Stockton, CA.

44) Virginia State Probation and Parole Detective Mindy Grizzard, Richmond, Virginia.

45) ATF Chief Mike Bukovac, Washington D.C.

46) ATF Acting Director Michael Sullivan, Boston, MA (resigned).

47) ATF Deputy Director Ronnie Carter, Washington D.C.

48) ATF Assistant Director William Hoover, Washington D.C.

49) ATF Assistant Director Carson Carroll, Washington D.C.

50) ATF Chief Raymond Rowley, Washington D.C.

51) ATF Program Manager Michael O'Neil, Washington D.C.

52) Office of Senator John McCain, Chief of Staff (AZ), Paul Hickman, Phoenix, AZ.

53) Tucson Police Department Captain Michael Gillooly, Tucson, AZ.

54) Tucson Police Department Lieutenant James McShea, Tucson, AZ.

55) Pima County Sheriff's Detective Jessica Martin, Tucson, AZ.

56) Pima County Sheriff's Detective Jeff Whitbeck, Tucson, AZ.

57) Pima County Sheriff's Sergeant Wayne Thibot, Tucson, AZ.

58)   ATF Special Agent Tristan Moreland, Phoenix, AZ.

59)   ATF Special Agent Michael Hildick, Phoenix, AZ.

60)   ATF Special Agent Matt Bayer, Tucson, AZ.

61)   ATF Special Agent Tom Vlahoulis, Tucson, AZ.

62)   ATF Chief Steven Pugmire, Washington D.C.

63)   Assistant United States Attorney Michael Lang, Seattle, WA.

64)   Assistant United States Attorney Tessa Gorman, Seattle, WA.

65)   Assistant United States Attorney Tate Chambers, Chicago, IL.

66)   Washington State Patrol Detective Brian Ducommun, Seattle, WA.

67)   FBI Special Agent Chad Anderson, Seattle, WA.

68)   FBI Special Agent in Charge Laura Laughlin, Seattle, WA.

69)   ATF Director Carl Truscott, Director (resigned).

70)   ATF Special Agent in Charge Edgar Domenech, Washington D.C.

71)   ATF Deputy Director Michael Bouchard, Washington D.C. (resigned).

72)   ATF Special Agent in Charge Dewey Webb, Houston, TX.

73)   ATF Special Agent in Charge Lester Martz, Phoenix, AZ (retired).

74)   ATF Assistant Special Agent in Charge Joseph Gordon, Phoenix, AZ
       (resigned).

75)   ATF Chief Marvin Richardson, Washington D.C.

76)   ATF Resident Agent in Charge Sigberto Celaya, Tucson, AZ.

77)   ATF Special Agent in Charge Richard Chase, Denver, CO.

78)   ATF Special Agent in Charge John Torres, Los Angeles, CA.

79) ATF Assistant Special Agent in Charge James Crowell, Los Angeles, CA (resigned).

80) ATF Attorney Eleanor Loos, Washington D.C.

81) ATF Assistant Director Larry Ford, Washington D.C.

82) ATF Special Agent in Charge Andrew Traver, Chicago, IL.

83) ATF Assistant Director Kelvin Crenshaw, Washington D.C.

84) ATF Chief Scot Thomason, Washington D.C.

85) ATF Attorney Anthony Torres, Washington D.C.

86) ATF Chief Marino Vidoli, Washington D.C.

87) ATF Chief Amy Walck, Washington D.C.

88) ATF Special Agent in Charge William Newell, Phoenix, AZ.

89) ATF Resident Agent in Charge Charles Higman, Tucson, AZ.

90) ATF Assistant Special Agent in Charge George Gillette, Phoenix, AZ.

91) ATF Retained psychiatrist Daniel Blumberg, San Diego, CA.

92) Doug Iardella - ATF Task Force Agent - retired - Burlington, VT.

93) Craig Caridine - ATF OCEDTC Coordinator - Baltimore, MD.

94) Joe Stafford - ATF supervisor - retired - San Francisco, CA.

95) Andrew Worrell - ATF Special Agent - Hartford, CNN.

96) Rene Jacquez - ATF Supervisor - Washington, DC.

97) Richard Marianos - ATF Supervisor - Washington, DC.

98) Stewart Lowery - ATF ASAC - New Orleans, LA.

99)   Shawn Wood - Arizona Department of Public Safety Sergeant - Phoenix, AZ.

100)  Charles Fuller - ATF Special Agent - retired - Bruswick, GA.

101)  G. Elaine Smith - ATF Bureau Deciding Official - Washington, DC.

102)  Tom Diaz - Violence Policy Center - Washington, DC.

103)  Kelli Arena - CNN Correspondent - Washington, DC.

104)  Jim Spellman - CNN Producer - Washington, DC.

105)  Dennis Wagner - Reporter Arizona Republic Newspaper - Phoenix, AZ.

106)  Leo Banks - Reporter Tucson Weekly Newspaper - Tucson, AZ.

107)  Tracy Biggs, Legal Counsel Office of Special Investigations - Washington, DC.

108)  Known and Unknown ATF Special Agents in the Tucson and Phoenix Field.

109)  Offices, Tucson/Phoenix, AZ.

110)  Gwen Jones, wife of Agent Dobyns.

111)  Dale Dobyns, daughter of Agent Dobyns.

112)  Jack Dobyns, son of Agent Dobyns.

113)  ATF Special Agent Jay Dobyns.

## **EXHIBITS**

Exhibit list to be provided at the initial hearing or at the request of the Court and/or following discovery, depositions and Freedom of Information Act (FOIA) responses.

## **PRAYER FOR RELIEF**

## **(DAMAGES)**

WHEREFORE, Plaintiffs Jay Anthony Dobyns, Gweneth Ann Jones, aka Gweneth Dobyns, Dale Jordan Dobyns, and Jack Coogan Dobyns, respectfully request of the United States Court of Federal Claims judgment against ATF and ATF Defendants and other respective and responsible personnel as follows:

Total damages demanded are four million and fifty thousand and 00/00 dollars ($4,050,000.00), as set forth more particularly as follows.

1.      Personal injury and pain and suffering incurred by Agent Dobyns in the amount of one million six hundred thousand dollars ($1,600,000.00), comprised of:

     a.   Medical injury and emotional distress to Agent Dobyns as a result of:

          i.      distress caused by ATF's breach of their own Settlement Agreement;

          ii.     distress caused by failure to investigate and/or protect Dobyns and his family from death and safety threats;

          iii.    distress caused by ATF's failure to protect Dobyns and Family, thus forcing Dobyns to undertake the protection of his family on his own;

    iv.    distress from ATF harassment, hostile work environment,

           reprisals, extortion, and coercion;

    v.     distress caused by ATF's defamation of Dobyns's character,

           personal reputation and professional reputation;

    vi.    distress caused by ATF's use of unnecessary and retaliatory

           transfer of Dobyns;

    vii.   distress from transfers causing Dobyns to be separated from

           his Family at times of crisis;

    viii.  distress from ATF's HIPAA violations related to Dobyns's

           medical records; and

    ix.    excessive damage to Dobyns's quality of life; and,

b.  Personal injury and pain and suffering incurred by Dobyns's wife and

    two children in the amount of six hundred thousand dollars

    ($600,000.00 - $300,000.00 to Gweneth Ann Jones, aka Gwen Dobyns;

    $150,000.00 to Dale Dobyns; $150,000.00 to Jack Dobyns), as follows:

    i.     medical injury and emotional distress to Family as a result

           of:

           aa)    distress caused by unattended death and safety

                  threats;

           bb)    distress caused by unattended, specific, credible and

                  undefended threats to gang rape Dobyns's wife;

       cc)    distress caused by unattended, specific, credible and undefended threats to rape Dobyns's daughter;

       dd)    distress caused by ATF's defamation of Dobyns's wife's character;

       ee)    distress caused by ATF's use of unnecessary and retaliatory transfers of Dobyns and Family;

       ff)    distress from said transfers causing Dobyns to be separated from his Family at time of crises;

       gg)    distress from ATF's HIPAA violations related to Dobyns's Family medical records; and

       hh)    excessive damage to Dobyns's family's quality of life;

2.    Wages in the amount of one million eight hundred and fifty thousand dollars ($1,850,000.00), reflecting current salary and agency paid benefits of $185,000.00 per year (per FERS Personal Benefits Statement for Dobyns for 2007) for ten years through age fifty-seven; and in addition,

3.    Attorney fees in an amount to be established at trial and expected to be not less than $200,000.00;

4.    Together with costs and interest on demand, costs and attorney fees; and

//

//

5.      Such other and further relief as the Court deems just and appropriate.

RESPECTFULLY SUBMITTED this 2nd day of March, 2009.


                              /s/ James B. Reed
                              James B. Reed
                              BAIRD WILLIAMS & GREER, LLP
                              6225 North 24th Street, Suite 125
                              Phoenix, Arizona 85016
                              *Attorneys for Jay A. Dobyns, Gweneth A.*
                              *Jones, aka Gweneth Dobyns, Dale J. Dobyns*
                              *and Jack C. Dobyns*